UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,

                                  Case Number 06-20514-BC
v.                                  Honorable Thomas L. Ludington

PATRICK KALAHAR,

          Defendant.

_____ /

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR
JUDGMENT OF ACQUITTAL AS TO COUNTS II, III, IV, AND V OF FIRST
SUPERSEDING INDICTMENT, DENYING DEFENDANT'S MOTION
WITH RESPECT TO COUNT I, SETTING ASIDE JURY'S VERDICT
WITH RESPECT TO COUNTS II, III, IV, AND V, AND
ENTERING ACQUITTAL AS TO THOSE COUNTS**

On October 25, 2006, the defendant, Patrick B. Kalahar (Kalahar) was charged in a five-count first superceding indictment with bank fraud and bankruptcy fraud in violation of federal law. The matter proceeded to trial on April 10, 2007. At the conclusion of the government's proofs, Kalahar made an oral motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure Rule 29. In the interest of judicial economy, the Court deferred ruling on Kalahar's motion as permitted by Rule 29(b) until such time as the jury had reached a verdict. Following the testimony of the defendant, at the close of the evidence, Kalahar renewed his motion for judgment of acquittal. The Court deferred ruling on the matter again, for similar reasons.

On April 13, 2007, the jury returned a guilty verdict on all counts of the superseding indictment. At the conclusion of the trial, the Court directed the parties to provide supplemental briefing on Kalahar's motion, indicating that it would take the matter under advisement, and set the matter for hearing. The parties have complied with the Court's directive. On April 30, 2007,

Kalahar and the government submitted supplemental authority. The Court head oral argument on the motion on May 21, 2007. After considering the parties' arguments and reviewing the trial exhibits, the Court concludes that there was sufficient evidence for the jury to consider Count 1 of the superseding indictment, but insufficient evidence for jury consideration of the remaining counts. The Court therefore will grant in part and deny in part Kalahar's motion and vacate the jury's verdict with respect to Counts 2 through 5 of the first superseding indictment.

I

As noted, Kalahar was charged in a five-count first superseding indictment on October 25, 2006. The first three counts alleged bank (credit union) fraud, *see* 18 U.S.C. § 1344, and the final two counts alleged that he made false representations in his personal bankruptcy schedules. *See* 18 U.S.C. § 152.

Kalahar, approximately 47-years-old at the time of trial, began his working life following graduation from college, as an employee of a predecessor to the victim credit union in this matter, Credit Union Plus. Credit Union Plus's primary place of business is located in Bay City, Michigan. Kalahar finished up his employment with Credit Union Plus as its chief executive officer. He acknowledged being familiar with its operations and with financial transactions generally.

In approximately 1994, Kalahar left his position at Credit Union Plus to join a business that acquired vans and then adapted them for use by handicapped people. The business included Freedom Driving Aids of Illinois, Inc., Freedom Driving Aids, Inc., Freedom Driving Aids of Grand Rapids, LLC and Freedom Driving Aids of Brighton, LLC. (Freedom) but operated as a consolidated enterprise. Freedom maintained store locations in Bay City, Michigan, Grand Rapids, Michigan, Brighton, Michigan, Plainfield, Illinois and Des Plains, Illinois. However, by at least May of 2002,

according to Kalahar's later bankruptcy filing, Freedom began experiencing significant cash flow problems that required, for example, Patrick Kalahar and his wife Janine to personally guarantee the businesses' trade creditors including the business that furnished the vans to Freedom for adaptation and sale to customers. (*See* Workout Agreement dated May 2, 2002 attached to Complaint to Determine Dischargeability of Debt under 11 U.S.C. § 523 (providing for the personal guarantee of over $559,279 to Gettel Motors)).

Kalahar testified that he left Freedom when the business continued to have problems and his business partners were no longer willing to go forward. Kalahar thereafter formed a new business organization – Kalahar Mobility, LLC (Mobility), a wholly-owned domestic limited liability company. (*See* Gov't Tr. Ex 113; Articles of Organization filed with the State of Michigan on January 15, 2004) . Kalahar's interest in Mobility is reflected in his later bankruptcy schedule B, as well as his salary from both Freedom and Mobility in his Statement of Financial Affairs, as follows:

| Amount | Source | |
|--------|--------|---|
| $70,350 | Kalahar Mobility | FY: 1/1/04 to 12/31/04 |
| $127,000 | Freedom Group | FY: 1/1/03 to 12/31/03 |

Kalahar's bankruptcy schedules also disclose:

- His personal checking and savings accounts at Credit Union Plus (415 Washington Avenue, Bay City)

- The remaining balance in his Oppenheimer IRA of some $2,714.15

- Several personal loans or credit card debts owed to Credit Union Plus

- Over $377,085 owing to Litton Loan Servicing, $200,000 to Jim Gettel of Gettel Motors, $740,000 to Ford Motor Company, and over $1,000,000 to Oakridge Financial, LLC.

Kalahar testified at trial that in order to convince a number of vendors to do business with Mobility

that were owed money by Freedom, he was asked and agreed to personally guarantee Freedom's prior debt obligations.  He also explained that he was often away from the Bay City office; the nature of his business required him to travel.

The principal business office for Mobility was Bay City, Michigan.  However, Mobility also continued to do business at two stores in Illinois.  Mobility maintained business deposit accounts in Bay City at Credit Union Plus and in Illinois at Prairie Bank & Trust Company in Plainfield, Illinois.  When sales were made at the Illinois business, the proceeds  would be deposited with Prairie.  When sales were made in Bay City, the proceeds would be deposited at Credit Union Plus.

The business office in Bay City was primarily managed by Melissa Wood who testified at trial that she was responsible for accounts receivable, preparation of financial statements, payroll, and human resources.  She explained that Mobility employed between 35 and 40 employees.  Ms. Wood started working for Mobility in May of 2000 and her employment ended in November 2004.  She supervised one employee, Ms. Sue Pike, who also testified at trial.  Ms. Pike was hired on approximately July 13, 2004 and left when the business closed about two months later.  Ms. Wood testified that she, in the ordinary course of business, would withdraw money deposited to the Prairie Bank account and deposit it to the business's primary bank account at Credit Union Plus.

Count 1 (bank fraud) of the indictment charged Kalahar with knowingly executing a scheme and artifice to defraud Credit Union Plus.  Specifically, it was alleged that "on or about July 28, 2004 Patrick Kalahar deposited a [personal] IRA disbursement check in the approximate amount of $63,860.72 into [Mobility's account] at Credit Union Plus, well knowing that a stop payment had been placed on the check . . . and then subsequently withdrew money from his account from the deposited funds."  The IRA account was maintained with Oppenheimer & Co., located in Detroit,

Michigan.

Counts 2 and 3 also allege Kalahar "knowingly executed a scheme and artifice to defraud Credit Union Plus." Count 2 alleges that "on or about July 29, 2004 Patrick Kalahar deposited . . . a check in the approximate amount of $80,500 drawn on Prairie, well knowing that it did not have sufficient funds and subsequently withdrew money from his account." The check was drawn on Mobility's account at Prairie and deposited to Mobility's account at Credit Union Plus and designated "for deposit only." *See* Gov't Tr. Ex. 101A. The check was signed by employee Sue Pike. *See* Gov't Tr. Ex. 102.

Count 3 made very similar factual allegations about a $90,810 Mobility check drawn on July 30, 2004, a day later, in the amount of $90,810 and again signed by Sue Pike as the drawer. Ms. Wood testified that retrieving funds from the Prairie Bank to Credit Union Plus, the business's primary bank, in the amount of eighty and ninety thousand dollars was not unusual and that she would routinely deposit funds on hand at Prairie Bank to its primary business account at Credit Union Plus using the ATM. She believed that the reason there were insufficient funds to cover the checks alleged in Counts 2 and 3 of the indictment was probably because the Illinois store expected funds for a vehicle sale that did not occur. When questioned, she explained that Kalahar did not blame her when he spoke with her about the problem; that they were all just concerned about why the overdraft occurred. She also testified that she had no recollection of speaking with Kalahar before authorizing the checks to be prepared and deposited to Credit Union Plus. She did testify that she left him an internal email to tell him about both the Oppenheimer check and the overdrafts resulting from the checks related to Counts 2 and 3.

It was also acknowledged at the time the checks subject to Counts II and III were signed by Ms. Pike and that Kalahar had never personally met Ms. Pike. In fact, Ms. Pike had been recently hired by Ms. Wood. Ms. Wood also acknowledged that Ms. Pike would only have prepared and signed the checks at her direction.

The circumstances surrounding Count 1 and the Oppenheimer checks were a bit more involved. Kalahar testified that he sought to withdraw his savings from his IRA somewhat quickly as he needed the funds to payoff a former partner and because Mobility needed a cash contribution as a result of continuing cash flow problems. Kalahar contacted his account executive, Mark Denay, at Oppenheimer & Co. on or about March 9, 2004 and requested a pay-out from his Individual Retirement Account (IRA). The amount requested was $63,860.72. Oppenheimer & Co. issued a check in that amount on or about March 11, 2004, and mailed it to the defendant's residence in Bay City from its Detroit office.

On or about March 18, 2004, however, Kalahar contacted Mr. Denay and informed him that he needed the funds as quickly as possible. He explained that the March 11 check had not arrived. Mr. Denay, accordingly, took steps to issue a replacement check in the sum of $63,860.72 on or about March 19, 2004. Mr. Denay testified that he hand-delivered the check to Kalahar within a few days. He recalled asking Kalahar to destroy the original check. Kalahar deposited the reissued check on or about March 23, 2004. Oppenheimer, of course, stopped payment on the March 11 check.

On or about July 28, 2004, some three months later, the March 11 Oppenheimer check was deposited to a Mobility account at Credit Union Plus. The check was endorsed by Kalahar. Kalahar testified that after requesting the replacement check, but before it arrived, the March 11 check came in the mail. Sometime before that, he had advised Ms. Wood that emergency funds would be

available in the form of the Oppenheimer check which he would leave endorsed in his desk if Mobility needed the additional contribution of funds for working capital. Kalahar testified that when he did receive the March 11 check he decided to deposit it and endorsed it on the way to the bank. During the course of his trip to the bank he phoned Mr. Denay who told him the March 11 check was now subject to a stop order and he would have to await receipt of the replacement check. Kalahar returned, he testified, to his office where he placed the endorsed check into his desk, pending the arrival of the replacement check. He acknowledged that he did not countermand his earlier instructions to Ms. Wood that she could use it in an emergency. Ms. Wood testified that on the day she decided she needed to use the check, she tried to contact the defendant in Chicago by phone and also left him an internal email. Unable to contact him, she deposited the check into Mobility's account. Ms. Wood did testify that shortly thereafter she did tell him that she deposited the Oppenheimer check and that his reaction was nothing out of the ordinary.

Credit Union Plus, at the time, let customers draw against the provisional credit for checks that had not cleared. Consequently and ultimately, it was left with a loss as a result of the activity in the Mobility accounts. The circumstance was summarized as follows by Kathy Dahlbeck, Credit Union Plus CEO, when she sought insurance reimbursement for Mobility's overdraft from CUNA Mutual Group in her correspondence dated August 20, 2004:

To Whom It May Concern:

Our member and former CEO Patrick Kalahar, owner of Kalahar Mobility, LLC has three outstanding deposited items returned to us. Two of the three checks were drawn on Kalahar Mobility LLC business account at Prairie Bank and Trust Company in Plainfield, Illinois. The first ck#579 $80,500.00 deposited 7/29, the second ck#850 $90,810.00 deposited 7/30 were both returned NSF on 8/10 thru the Federal Reserve. Both checks were deposited at an ATM machine located at 900 W Midland Street in Bay City, Michigan.

The third check ck#2872375 drawn on Oppenheimer & Company was included in a commingled deposit on 7/28 at an ATM machine located at 900 W Midland Street in Bay City, Michigan. This was returned on 8/4 thru the Federal Reserve at Payment stopped. We called Oppenheimer to determine who placed the stop payment and when it was placed. Check #2872375 for $63,860.72 was issued on 3-11-2004. This was a withdrawal from Patrick Kalahar's IRA. Per Oppenheimer Pat Kalahar called on 3/18 and said he never got the check. They placed a stop and reissued a new one on 3/19/04 ck#2872764 which was then cashed on 3/23/04.

Funds on deposit to offset the total outstanding checks of $235.170.72 are $52,609.03 as of 8/20/04 leaving a shortfall of $182,561.69.

Gov't Tr. Ex 118.

Shortly thereafter, Charles Barcia, Sr. wrote Mobility to the attention of Kalahar seeking payment of the account overdraft. Later, on September 2004, Kathy Dahlbeck wrote Mobility to the attention of Kalahar indicating that the Credit Union had "transferred funds available and closed all of the accounts" including a Mobility savings and checking account and the following personal accounts:

| 19700 00 | $51.84 | Patrick Kalahar – Savings |
| 19700 10 | $87.72 | Patrick Kalahar – Checking |
| 3956 00 | $592.91 | Patrick Kalahar – Savings |

Gov't Tr. Ex. 117.

Count 4 of the indictment related to the defendant's Summary of Schedules and Statement of Financial Affairs filed with the United States Bankruptcy Court on June 15, 2005. The schedules are signed by both Patrick and Janine Kalahar declaring "under penalty of perjury that I have read the foregoing summary and schedules consisting of 20 sheets and that they are true and correct to the best of my knowledge, information and belief." The defendant was represented by legal counsel in preparing both his bankruptcy petition and schedules.

Credit Union Plus is identified in Kalahar's bankruptcy mailing matrix and, as previously indicated several loans or credit card debts of Credit Union Plus are also reflected in Kalahar's bankruptcy schedules. The instructions for the schedules require disclosure of "all entities holding unsecured claims without priority *against the debtor*." (Emphasis added). Mr. Marian J. Mack, United States Bankruptcy Trustee, testified that Kalahar should only have included "personal liabilities" in his personal bankruptcy schedules. Kalahar testified that he did not list Mobility's liability to Credit Union Plus because he did not believe or understand himself to be personally responsible for the repayment of Mobility's overdraft. He did testify that he know the net result of one check being drawn on a Mobility account with insufficient funds being used to fund another Mobility account could technically be characterized as "kiting."

The bankruptcy file admitted into evidence as Government's exhibit 111 not only reflects Credit Union Plus in Kalahar's mailing matrix, it also reflects a "Reaffirmation Agreement Between Debtor (Kalahar) and Credit Union Plus." The document was prepared by Credit Union Plus's legal counsel. The bankruptcy file does not reflect *any* assertion by Credit Union Plus – by proof of claim or initiation of an adversary proceeding – that Credit Union Plus believed that Kalahar was personally responsible for Mobility's overdraft.

Count 5 of the indictment also relates to the defendant's Statement of Financial Affairs requiring a list of the financial accounts held in the name of the debtor or for the benefit of the debtor which were closed, sold or otherwise transferred within one year immediately preceding the commencement of this case. Kalahar was questioned during trial about several Mobility bank accounts, which he explained he did not include in the schedules because of their separate ownership by Mobility. The government's questioning therefore ultimately focused on two bank accounts –

one with an approximate $51 balance and the other with an approximate $87 balance as earlier noted – that Credit Union Plus closed. Kalahar explained that there would have been no activity in either of the accounts for some four or five years, that he believed them to be accounts he maintained for a hunting club in which he participated, and that he did not remember the accounts when he prepared his bankruptcy schedules.

## II.

The defendant brings his motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. That rule provides, in relevant part:

> (a) Before Submission to the Jury. After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. The court may on its own consider whether the evidence is insufficient to sustain a conviction. If the court denies a motion for a judgment of acquittal at the close of the government's evidence, the defendant may offer evidence without having reserved the right to do so.

> (b) Reserving Decision. The court may reserve decision on the motion, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict. If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved.

> (c) After Jury Verdict or Discharge.
> (1) Time for a Motion. A defendant may move for a judgment of acquittal, or renew such a motion, within 7 days after a guilty verdict or after the court discharges the jury, whichever is later.
> (2) Ruling on the Motion. If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal. If the jury has failed to return a verdict, the court may enter a judgment of acquittal.
> (3) No Prior Motion Required. A defendant is not required to move for a judgment of acquittal before the court submits the case to the jury as a prerequisite for making such a motion after jury discharge.

> (d) Conditional Ruling on a Motion for a New Trial.
> (1) Motion for a New Trial. If the court enters a judgment of acquittal after

a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed. The court must specify the reasons for that determination.

(2) Finality. The court's order conditionally granting a motion for a new trial does not affect the finality of the judgment of acquittal.

Fed.  R. Cr.  P.  29(a)-(d).

The defendant's motion was made at the conclusion of the government's proofs, and the Court deferred ruling as permitted by subsection (b), following the jury's return of guilty verdicts on all counts.  The defendant also renewed his motion at the close of all proofs. Rule 29 suggests that if the defendant makes his motion at the close of the government's case in chief and the Court defers ruling on the motion, "it must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Cr. P. 29(b).  However, it is well-established if the defendant testifies, as he did in this case, the Court is to examine the evidence adduced throughout the entire trial.  *See United Stats v. Black*, 525 F.2d 668, 669 (6th Cir. 1975) (providing that "the rule is settled that when a defendant introduces evidence, he waives any objection to the denial of his motion to acquit at the close of the government's case.  The defendant may renew his motion at the close of all the proof, as the defendant did here, but the court will then consider the sufficiency of the on the record as a whole and not the sufficiency of the government's case in chief").  This Court, therefore, must consider the defendant's motion in light of all evidence presented during the trial.

As the rule states, the Court may grant a motion for acquittal only if "the evidence is insufficient to sustain a conviction" of one or more of the charges in the indictment.  Logically, however, a "verdict in a criminal case is sustained only when there is relevant evidence from which the jury could properly find or infer, beyond a reasonable doubt, that the accused is guilty." *American Tobacco Co. v. United States*, 328 U.S. 781, 787 n.  4 (1946) (internal quotations and

citations omitted).  In adjudicating the defendant's motion, the Court must take the evidence in the light most favorable to the government and determine if "any reasonable jury could find guilt beyond a reasonable doubt." *United States v. Kelley*, 461 F.3d 817, 825 (6th Cir. 2006) (citing *United States v. Talley*, 164 F.3d 989, 996 (6th Cir. 1999)).  Sufficiency of the evidence is assessed in reference to the elements of the crimes, and whether the jury could find beyond a reasonable doubt each element of the offenses charged.  *Ibid.*

A.

The defendant first challenges the sufficiency of the evidence to support the material elements of bank fraud alleged in Count I of the superseding indictment.  The bank fraud statute, 18 U.S.C. § 1344 provides as follows:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice–
>
> > (1) to defraud a financial institution; or
> > (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
>
> shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

As noted, the allegations in Count I relate to a deposit of a personal IRA disbursement check for approximately $63,860.72 in Mobility's account at Credit Union Plus on or about July 28, 2004.

At trial, Kalahar acknowledged that he was under time pressure when he sought to withdraw savings from his IRA held at Oppenheimer and Company in Detroit Michigan.  He explained that Mobility required a cash contribution and the funds were otherwise needed to payoff a former partner.  On approximately March 9, 2004, Kalahar requested the IRA pay-out in the amount of $63,860.72 from Mark Denay who worked for Oppenheimer.  The company issued the check from

its Detroit office on March 11, 2004 and mailed it directly to Kalahar's personal residence in Bay City, Michigan.

The financial situation, however, became more serious. On March 18, 2004, Kalahar contacted Denay, informed him that the check had not arrived, and advised him that he needed the funds as soon as possible to close a business transaction with Former freedom partners. Denay then reissued the check and hand delivered it to Kalahar within a few days. Denay testified that he asked Kalahar to destroy the check.

The check was not destroyed. In fact, the original March 11 check was deposited into a Mobility account at Credit Union Plus on July 28, 2004 endorsed by Kalahar. Kalahar recalled that the March 11 check had come a few days after the hand delivery of the replacement check. He also recalled advising Wood that emergency funds, should she need them, for the continued operation of Mobility would be available to her in form of an endorsed Oppenheimer check in his desk drawer.

Kalahar testified that when he first received the March 11 check, he decided to immediately endorse it as he was driving to Credit Union Plus and deposit the funds. However, during the ride to the Credit Union, he thought to call Denay, who advised him that a stop payment had issued on the check and he would have to await delivery of the replacement check. Kalahar states that he returned to his office, placed the March 11 check in his desk, and forgot to tell Wood that the check was no longer valid and that she should not use it. Ultimately, Mobility's financial situation became so severe that Wood resorted to the March 11 check, although she attempted to contact Kalahar to inform him of her decision. After she deposited the money, she did tell Kalahar, whose reaction was nothing out of the ordinary, Wood testified.

As a result of depositing the check, Kalahar was able to draw on a provisional credit for checks that had not yet cleared and the Credit Union ultimately suffered a loss because of the stop payment issued on the March 11 check.

Thus, the defendant has offered a reasonable explanation for the circumstances surrounding the Oppenheimer checks. He simply and inadvertently failed to destroy the March 11 check after the replacement check arrived and he forgot to inform Ms. Wood that she no longer could use the funds because a stop payment had been issued for the check. However, it is equally plausible that the jury could discredit Kalahar's explanation and disbelieve that his conduct was the result of simple inadvertence. The Court therefore believes that the was sufficient evidence from which a jury could find beyond a reasonable doubt that Kalahar knowingly executed a scheme or artifice to draw upon the provisional credit Credit Union Plus offered at the time knowing that a stop payment had issued for the March 11 check.

## B.

Kalahar next contends that there was insufficient evidence to support a guilty veridct with respect to Counts 2 and 3 of the superseding indictment. These Counts focused on overdrafts in the amount of $80,500 (count 2) and $90,810 (count three). These checks were drawn on Mobility's account at Prairie and deposited in Mobility's account at Credit Union plus on July 29, 2004 and July 30, 2004, respectively. The indictment alleges that for each check Kalahar withdrew the money knowing that there was insufficient funds to support them.

The government argues that sufficient evidence was presented to the jury, from which it could conclude beyond a reasonable doubt, that Kalahar committed bank fraud. It premises its argument on what it asserts is long-established case law in this circuit that "check kiting" is an

appropriate basis for a bank fraud conviction. Check kiting, as the Sixth Circuit has explained, occurs under the following circumstances.

> "Kiting" occurs when accounts are maintained in different banks and checks are drawn on one account and deposited in the other when neither account has any substantial funds in it to pay the checks drawn on it. Since it takes several days to collect a check, each of the accounts will show substantial credits of uncollected checks, and those credits will continue so long as checks continue to be drawn every day in each bank and deposited in the other bank. If some checks are drawn to cash or to legitimate third parties, the checks that flow between the two banks have to be increased to maintain the "kiting" equilibrium.

*United States v. Street*, 529 F.2d 226, 229 (6th Cir. 1976) (quoting *United States v. Giordano*, 489 F.2d 327, 329 (2d Cir.1973)).

The Court cannot entirely agree with the government. As the Court explained in its jury instructions in this case, to which the government did not object, kiting by itself may be a method of proving an element of bank fraud. The fact that kiting occurs in and of itself did does not support a conviction for bank fraud. The Court's instruction read, in relevant part:

> By itself, the fact that kiting occurred in a given instance does not necessarily establish a "scheme or artifice" as described above. However, kiting may be one method that, when viewed in the totality of the evidence presented to you, the government may prove that there was a "scheme or artifice" to defraud a financial institution. Remember, the government must still prove that the defendant directed, executed, or attempted to execute that "scheme or artifice" and that the defendant had the specific intent to defraud a financial institution.

Dkt # 31, Jury Instructions at 9.

That instruction finds support in the case law. For example in *United States v. Stone*, 954 F.2d 1187 (6th Cir. 1992), the case upon which the government relies for the proposition that check kiting is a well established basis for conviction of bank fraud, did not answer the question of whether check kiting by itself supported a conviction for bank fraud, but merely suggested that check kiting *could* prove that a defendant "devised a scheme or artifice to defraud a financial institution." *Id.* at

-15-

1190. (further reasoning that "[t]his court has recently upheld a conviction for check kiting under the [scheme or artifice to] defraud provision of § 1344(1), *see United States v. Seago*, 930 F.2d 482, 486-87 (6th Cir.1991), thereby joining those circuits that have interpreted § 1344(1) to encompass check-kiting schemes within its strictures. *See, e.g., United States v. Celesia*, 945 F.2d 756, 758-59 (4th Cir.1991); *United States v. Schwartz*, 899 F.2d 243, 246 (3d Cir. 1990), *United States v. Taggatz*, 831 F.2d 1355, 1356-57 (7th Cir.1987)").

At any rate, even though a check-kiting could support a conviction by itself, the statute nonetheless requires, at a minimum, that the defendant be directing the check kiting. In *Stone*, the defendant himself wrote the NSF checks charged in the information. The present case, of course, is distinguishable.

The jury instruction also is supported by the plain language of the statute, which requires that a defendant "knowingly execute[], or attempt[] to execute, a scheme or artifice" to defraud a financial institution. 18 U.S.C. § 1344. Although kiting may be relevant to proof of bank fraud, the occurrence of kiting does not obviate the need for proof beyond a reasonable doubt that the defendant knowing executed or attempted to execute a scheme or artifice and that the defendant did so with the intent to defraud a protected institution.

In this case, the Court cannot discern support for the intent requirement or that it was Kalahar who knowingly directed any kiting to defraud the financial institutions at issue here. The government presents evidence that overdrafts occurred in the amounts of $80,500 and $90,810. The record establishes that it was Sue Pike that endorsed the checks and did so at the direction of Wood. In fact, Wood testified that Pike would only have prepared the checks after receiving instructions from her. Wood also explained that the amounts of the checks for 80 and 90 thousand dollars were

not uncommon and that she routinely deposited funds on hand at Prairie Bank into Mobility's primary account at Credit Union Plus using the ATM. Indeed, Wood believed that the reason for the insufficient funds alleged in Counts 2 and three were the result of vehicles sales that had not manifested as planned.

Importantly, Kalahar had no knowledge of Wood's actions. Nor had he ever personally met Pike. When Wood told Kalahar about the overdrafts, she explained that Kalahar did not blame her and that the primary focus of the conversation when Kalahar was apprised of the situation was why it had occurred. Pike, the person who actually endorsed the checks at the direction of Wood, had only recently been hired by Wood and Kalahar had not yet had the opportunity to meet her.

In the end, the government can only point to the testimony of an office manager that prepared checks and had an employee sign them. The record supports little more than Wood's belief that she and Pike would not have written the checks had they know there were insufficient funds because of a mistake. The proofs demonstrated no prior knowledge or direction by Kalahar. The Court therefore believes that there is insufficient evidence from which a jury reasonably could have found beyond a reasonable doubt that Kalahar executed or attempted to execute a check kiting scheme to defraud Credit Union Plus of funds.

## C.

Finally, Kalahar maintains that there was insufficient evidence form which the jury could have convicted him on bankruptcy fraud, counts 4 and 5 of the superseding indictment. Count 4 faults Kalahar with failing to disclose in his bankruptcy schedules filed on June 15, 2005 with United States Bankruptcy Court for the Eastern District of Michigan "all entities holding unsecured claims without any priority against the debtor." In other words, entities holding claims for which he

had "personal liability."  Count five alleges that Kalahar failed to fully disclose financial accounts held in the name or the debtor or for the benefit of the debtor in his Statement of Financial Affairs filed on the same day and in the same bankruptcy court.

The bankruptcy fraud statute, 18 U.S.C. § 152, provides as follows:

A person who–

(1) knowingly and fraudulently conceals from a custodian, trustee, marshal, or other officer of the court charged with the control or custody of property, or, in connection with a case under title 11, from creditors or the United States Trustee, any property belonging to the estate of a debtor;

(2) knowingly and fraudulently makes a false oath or account in or in relation to any case under title 11;

(3) knowingly and fraudulently makes a false declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, in or in relation to any case under title 11;

(4) knowingly and fraudulently presents any false claim for proof against the estate of a debtor, or uses any such claim in any case under title 11, in a personal capacity or as or through an agent, proxy, or attorney;

(5) knowingly and fraudulently receives any material amount of property from a debtor after the filing of a case under title 11, with intent to defeat the provisions of title 11;

(6) knowingly and fraudulently gives, offers, receives, or attempts to obtain any money or property, remuneration, compensation, reward, advantage, or promise thereof for acting or forbearing to act in any case under title 11;

(7) in a personal capacity or as an agent or officer of any person or corporation, in contemplation of a case under title 11 by or against the person or any other person or corporation, or with intent to defeat the provisions of title 11, knowingly and fraudulently transfers or conceals any of his property or the property of such other person or corporation;

(8) after the filing of a case under title 11 or in contemplation thereof, knowingly and fraudulently conceals, destroys, mutilates, falsifies, or makes a false entry in any recorded information (including books, documents, records, and papers) relating to the property or financial affairs of a debtor; or

(9) after the filing of a case under title 11, knowingly and fraudulently withholds from a custodian, trustee, marshal, or other officer of the court or a United States Trustee entitled to its possession, any recorded information (including books, documents, records, and papers) relating to the property or financial affairs of a debtor, shall be fined under this title, imprisoned not more than 5 years, or both.

(Formatting altered).

With respect to Count 4, the government believes that Kalahar perpetrated a fraud on the bankruptcy court by failing to disclose the consolidated amount of the overdrafts from Credit Union Plus.

The Court cannot agree. Kalahar entered into personal bankruptcy proceeding under Chapter 11 of the Bankruptcy Code. The personal nature of the bankruptcy required, as explained by the United States Bankruptcy Trustee, that Kalahar disclose debts for which he was personally liable. It was Kalahar's understanding that liability for the overdrafts remained with Mobility, and he was not separately liable for those amounts because they were incurred by the corporate entity. As a result, he did not list the overdraft amounts in his bankruptcy schedules.

The government contends that Kalahar did in fact list certain Mobility debts in his schedules and from that fact and inference can be drawn that he had an obligation to list the Credit Union plus overdrafts. Kalahar was represented by counsel when he filed his schedules. The government's contention is unavailing. As required, Kalahar listed his interest in Mobility and Freedom in bankruptcy schedule B as well as the salary he received from both entities in his Statement of Financial Affairs – $70,350 from Mobility and $127,00 from Freedom. Kalahar's schedules also reflected Mobility debts of over $377,085 owing to Litton Loan Servicing, $200,000 to Jim Gettel, $740,000, and over $1,000,000 to Oakridge Financial, LLC.

However, Kalahar explained that these Mobility debts were listed on his schedules because he had personally guaranteed the amounts. He testified at trial that to convince certain vendors to do business with Mobility, he was asked to personally guarantee Freedom's prior debt obligations. Since he personally guaranteed these amounts, Kalahar was required to list the debts in his bankruptcy schedules.

Significantly, Credit Union plus participated as a creditor in Kalahar's personal bankruptcy. It was reflected in Kalahar's bankrupty mailing matrix. In addition, government trial exhibits reflect a "Reaffirmation Agreement Between Debtor (Kalahar) and Credit Union Plus." *See* Gov't Tr. Ex. 111. What the bankruptcy file does not contain is *any* assertion by Credit Union Plus – by proof of claim or initiation of an adversary proceeding – that Kalahar was personally responsible for Mobility's overdraft. Thus, the victim in this case, Credit Union Plus, who fully participated in Kalahar's bankruptcy proceedings, found no error in the manner in which Kalahar completed his bankruptcy schedules.

The government nonetheless urges in its post-trial papers that Kalahar was an alter ego of Mobility and that he was therefore required to list the Mobility overdrafts. The only proof of this theory is that Kalahar wholly owned Mobility and was its sole shareholder. As a basic principle of law, an LLC is considered a separate individual for purposes of liability. *See Dep't of Consumer & Industry Services v. Shah*, 236 Mich. App 381, 393, 600 NW2d 406, 412 (1999). That principle is not without exception, and at times the "corporate veil" may be pierced in order to find an officer liable. *Ibid.* However, the corporate form may only be disregarded under limited circumstances. The notion that Kalahar was personally responsible for Mobility's overdraft as an alter ego or some other legal theory was first developed in the post-trial papers. Indeed, a debtor's attempt to hide an asset is the usual case; the idea that a debtor would seek to "hide" a liability from a bankruptcy discharge is unusual.

The Court concludes that Kalahar properly completed his bankruptcy schedules in light of the personal nature of the proceedings. The record contains no evidence that Kalahar was responsible for Mobility's overdraft, and there was therefore insufficient evidence from which a jury

could find guilt beyond a reasonable doubt as to the conduct identified in Count 4 of the indictment.

Finally, Count 5 focuses on Kalahar's alleged failure to disclose closing two personal bank accounts in the year prior to filing bankruptcy proceedings. The first account reflected an approximate balance of $51 and the second an approximate balance of $87. Kalahar's uncontradicted testimony was that there had been no activity in the accounts for four or five years and that he believed them to be accounts he maintained on behalf of a hunting club. He explained that he did not remember the accounts when he prepared his bankruptcy schedules.

The Court is unpersuaded that sufficient evidence exists for a jury to convict Kalahar of bankruptcy fraud on the basis of these two accounts. An essential element of bankruptcy fraud is that the failure to disclose be material. As the jury instructions explained, "[a] matter is 'material' if it has a natural tendency to influence, or is capable of influencing, the outcome of the bankruptcy proceeding." Jury Instructions at 11. In light of the entire bankruptcy case, including the fact that Kalahar's liabilities exceeded his assets by well over $1,000,000, these two accounts cannot be said to be material. Simply stated, there was insufficient evidence from which a jury could find, beyond a reasonable doubt, the material elements of bankruptcy fraud as alleged in Count 5.

III.

Sufficient evidence was offered by the government to permit the jury to find beyond a reasonable doubt the material elements of bank fraud as alleged in Count 1 of the superseding indictment. There was, on the other hand, insufficient evidence to support the remaining charges, Counts 2 through 5 of the superseding indictment. The Court must, in its view, vacate the jury's convictions with respect to those counts.

Accordingly, it is **ORDERED** that the defendant's oral motion for judgment of acquittal is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that the jury's verdict with respect to Counts 2 through 5 of the first superseding indictment is **SET ASIDE** and an acquittal is **ENTERED** as to those counts. The jury's verdict as to Count 1 remains in full force and effect.

It is further **ORDERED** that the defendant appear for sentencing on Count 1 on **August 13, 2007 at 2:30 p.m.**

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: May 23, 2007

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on May 23, 2007.

s/Tracy A. Jacobs
TRACY A. JACOBS